■ LEONARD WILLIG, Doing Business as BALFOUR CROWN ASSOCIATES, Respondent, v MARTIN RAPAPORT et al., Appellants, et al., Defendant. (Action No. 1.) LEONARD WILLIG, Doing Business as BEDFORD CARROLL ASSOCIATES and as BALFOUR CROWN ASSOCIATES, Respondent, v BERNARD ALTER et al., Appellants. (Action No. 2.) — Defendants (except Fred Harmer) appeal from an order of the Supreme Court, Kings County, dated January 5, 1979, which, *inter alia,* granted plaintiffs' motion to vacate a stipulation and any orders entered as a result of the stipulation. Order reversed, on the law and the facts, with one bill of costs payable to the appellants appearing separately and filing separate briefs, motion denied, the stipulation and orders of the Supreme Court, Kings County, dated May 28, 1976 and June 8, 1976, respectively, are reinstated and the matter is remitted to the Supreme Court, Kings County, for further proceedings consistent herewith. Although the Referee made no findings of fact or conclusions of law, the record before this court is sufficient for us to make our own findings. On June 22, 1973 a "Collective Bargaining Agreement" was entered into between Balfour Crown Associates (Balfour), represented by Leonard Willig, and the 150 Crown Street Tenants' Association, which provided for an escrow fund to be established to provide money to make repairs at 150 Crown Street, Brooklyn, necessitated by prior gross mismanagement by Willig. As the result of a suit by the tenants, trustees (defendants Rapaport, Harmer and Meltzer) were appointed, by order of then Civil Court Judge Welcome, to oversee the

escrow fund. Thereafter in May of 1974 the Housing and Development Administration (HDA) commenced an action in the Civil Court, Kings County, against Balfour, Willig and the trustees to require the correction of more than 300 violations at 150 Crown Street. On June 25, 1974 an order was made on consent of Willig, who was represented by counsel, directing that certain repairs be made within a designated time. Reinspection of the premises after the deadline revealed substantial noncompliance and HDA brought a contempt proceeding against Willig. On December 5, 1974, in open court, Willig, while represented by counsel, consented to the entry of an order, *inter alia,* holding him in contempt, fining him $1,000, and sentencing him to 30 days in jail. The sentence was to be stayed, with Willig to comply with certain conditions. When he failed to comply with the order, HDA moved to vacate the stay. Hearings were held while settlement negotiations went on with Willig, now represented by a new attorney, James Peck. On June 10, 1975 Willig stipulated in open court to turn over control of 150 Crown Street and two other deteriorating buildings to court appointed trustees and to pay a $20,000 fine to be used for repair of the buildings. In addition the stay of the 30-day jail sentence was continued. Approximately six months later, the stipulation not having been complied with, the HDA again moved for entry of judgment against Willig and for vacatur of the stay of the 30-day jail sentence. Prior to this time, the three trustees who had been appointed by the court to oversee the escrow fund applied for approval of their accounting and for discharge. Subsequently, Willig instituted two lawsuits, one against these three trustees, and the other against Bernard Alter, Richard Salzman, Ruth Sjogren, Bruce Kramer,* and the HDA. All of the foregoing matters were consolidated before Justice Welcome, who had become a Supreme Court Justice in January, 1975. On May 7, 1976, which was a Friday, the proceedings began at about 10:30 A.M. Willig was represented by a third attorney, Jon Emanuel. First, Martin Rapaport, one of the trustees, testified about the accounting. Thereafter, a lawyer, who represented a number of tenants from 150 Crown Street involved in nonpayment proceedings in the Civil Court which had been referred to Justice Welcome, entered the courtroom. At this point, the Judge asked all the lawyers (a total of nine) to come into his chambers for a continuation of negotiations. After intensive negotiations, lasting until about 5:00 P.M., an agreement was reached whereby, *inter alia,* Willig's fine would be reduced to $5,000, said sum to be used for the benefit of the property. In addition, Willig agreed to discontinue his lawsuits. The jail sentence was also suspended pending further action. Moreover, the trustees were released and discharged from all liability. After the stipulation had been dictated and transcribed, and in the presence of the phalanx of attorneys in the Judge's chambers, Willig was asked to sign it. Willig then engaged with the Judge in a long discussion during which he indicated that he would sign, albeit with strong reservations. The Judge insisted on an all or nothing arrangement, i.e., that he sign or if he failed to sign, that the proceedings be continued. Willig continued arguing, but despite his twistings and his turnings and his tergiversation, the court politely but firmly insisted on a definite answer. Finally, Willig gave his unqualified consent and signed. On May 28 and June 8, 1976 orders implementing the stipula-

* These individuals are attorneys who represented the following interests: Bernard Alter of counsel to Corporation Counsel, and coattorney with Richard Salzman for 150 Crown Street Tenants' Association. Ruth Sjogren (150 Crown Street Tenants' Association). Bruce Kramer of counsel to HDA.

tion were entered. However, Willig failed to comply with the stipulation. Rather, he filed a notice of appeal from the May 28 order. The appeal was never prosecuted. Then on December 20, 1976 Justice Welcome died. Whether by happenstance or design, Willig waited until a few months after the Judge's death before moving to set aside the stipulation; and when he did he made the bald assertion that he had been coerced into signing it. In August of 1977 an order of reference was made, and by stipulation, hearings were held before former Justice Multer. Willig testified to the alleged coercion, asserting that he was threatened with incarceration if he did not sign the stipulation. Jon Emanuel, the attorney who had represented him on May 7, 1976 also testified that Justice Welcome had threatened Willig with the jail sentence, although he said the threats were made off the record. The other eight lawyers and the one court officer who were in the courtroom for the entire proceeding on May 7 testified that Justice Welcome had never threatened to jail Willig. Two of the witnesses who testified to this fact are disinterested persons who are not involved in this lawsuit. On January 5, 1979 Referee Multer ordered, inter alia, that the stipulation be vacated. There were no findings of fact or conclusions of law made. The law is well settled that threats of arrests or imprisonment may constitute such duress as will render a contract entered into, or an act performed under the influence of such threat, voidable at the election of the person threatened. It is immaterial whether such person was guilty or innocent of the act for which arrest or imprisonment was threatened in order for there to be duress. On the other hand, it does not constitute duress to do what one has the legal right to do (see 17 NY Jur, Duress and Undue Influence, §§ 18, 19, 21). The Referee incorrectly concluded that Willig executed the stipulation in question under duress after being threatened with incarceration by Justice Welcome. On the contrary, the record indicates that at all times Willig was represented by an attorney who went to considerable effort to negotiate the stipulation in question. All that Justice Welcome did was to inform Willig that if he did not enter into the stipulation, he (Welcome) would grant the motion to vacate a prior stay of the 30-day jail sentence. In view of Willig's long-standing recalcitrance, Justice Welcome was acting properly in telling Willig that if he did not finally settle the matter, the stay of the jail sentence would be vacated (see Helwig v Wilkens, 51 AD2d 694, mot for lv to app dsmd 39 NY2d 798). In light of our determination the case must be remanded to the Supreme Court, Kings County, for further proceedings on the contempt matter. Lazer, J.P., Mangano, Cohalan and Margett, JJ., concur.